UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08CV-646-H

THE FIRST CAPITAL BANK OF
KENTUCKY, et al.                                                                                  PLAINTIFFS

V.

WILLIAM HAMMANN and
MICHELE HAMMANN                                                                          DEFENDANTS

**MEMORANDUM OPINION**

The Amended and Supplemental Complaint seeks a declaration as to the validity of a settlement agreement between The First Capital Bank of Kentucky ("First Capital") and William Hammann, as well as a judgment against Mr. and Mrs. Hammann on their loan note with First Capital. On March 3, 2010, First Capital moved for summary judgment on both claims. After Defendants' counsel withdrew, this Court allowed them additional time to and including May 3, 2010, in which to take discovery and respond to the motion. Unfortunately, Defendants have not retained new counsel. However, in a timely fashion, they moved *pro se* for a protective order, to compel discovery and to deny the motion.

For the reasons that follow, the Court concludes that First Capital has proven its note and the release of all claims and disputes arising prior to it. The valid agreement among the parties determines the result here and entitles First Capital to a judgment against Defendants.

**I.**

The current dispute arose from a banking relationship between First Capital and the Banta Development Group ("BDG"), which was a real estate company owned by Mr. Hammann

and Richard B. Banta. Among other things, First Capital provided BDG with operating capital and a line of credit. Unfortunately, the business of BDG did not proceed as planned, and disputes arose among First Capital, Banta and Hammann. In 2003, after some difficult times, Banta assigned his interest in BDG to First Capital. These events left Hammann and First Capital, for all practical purposes, as equal owners of BDG. Unfortunately, this joint arrangement did not go well and disputes developed between the two.

The parties entered into extensive negotiations to separate their interests. Eventually, on July 22, 2004, First Capital and Hammann entered into a settlement agreement resolving their differences (the "Settlement Agreement"). As part of the Settlement Agreement, the parties agreed that First Capital would take ownership of certain properties, Hammann would be released from certain indebtedness and First Capital would loan Hammann and his wife $150,000.00. First Capital secured its new loan to the Hammanns with an assignment of an interest in Hammann Enterprises, another real estate venture they owned. As part of the Settlement Agreement, the parties agreed to a comprehensive mutual release of all claims as follows:

> In consideration of the obligations set forth here, to which [First Capital Bank] and Hammann agree they are not otherwise entitled, and the sufficiency of which the parties acknowledge for themselves, as well as their respective heirs, personal representatives, successors and assigns, each party hereby fully and forever releases, acquits, holds harmless, discharges the other party to this Agreement, their agents, officers and employees and each of their respective heirs, personal representatives, successors and assigns, of and from any and all claims, demands, actions, causes of action, obligations, damages, costs, or expense of any nature which they may have against any other party to this Agreement, known and unknown, arising from or related to their relationship to the date of this Agreement.

Perhaps even prior to entering into the Settlement Agreement, First Capital began considering the possibility of locating one of its branches in the Strathmoor Plaza, which was

one of the properties it obtained from BDG as part of the Settlement Agreement. The Hammanns believed it was improper for First Capital to use the property for a bank branch and, through a letter from counsel, sought to rescind the settlement agreement. Shortly thereafter, First Capital filed this action seeking declaratory relief that the settlement agreement was valid and binding. In May, 2009, the Hammann's discontinued payment on their note believing they would be successful in rescinding the settlement agreement and, therefore, would owe no money to First Capital. First Capital then amended its Complaint seeking a judgment on the note and enforcement of the assignment of interest in Hammann Enterprises.

At this time, First Capital seeks summary judgment declaring the settlement agreement valid and binding, granting it judgment on the note and assigning Hammann Enterprise to it. The Hammanns agree that they signed a note dated July 22, 2004, in the amount of $150,000 and that they stopped making payments on that note in April 2009. Their only defense to this proceeding is their claim that First Capital breached a number of fiduciary duties in negotiating and reaching the Settlement Agreement and that it fraudulently induced the Hammanns to enter into the Settlement Agreement. According to the Hammanns, these improprieties should invalidate the note. It is apparent, then, that if the Settlement Agreement stands, the loan is valid and First Capital is entitled to judgment.

## II.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). "The moving party has the 'initial responsibility of informing the district court of the

basis for its motion, and identifying those portions' of the record showing an absence of a genuine issue of fact." *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once that initial showing has been made, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

### III.

The Hammanns defenses arise exclusively from their relationship with First Capital and BDG's joint ownership of Strathmoor Plaza prior to the execution of the Settlement Agreement. The Settlement Agreement clearly releases all parties from any and all claims which could have arisen from their relationship. The language of the agreement could not be clearer. Defendants do not contest that the plain language applies to their claims. However, they allege that the entire Settlement Agreement should be voided because of fraudulent inducement and breaches of fiduciary duties. The Court finds no basis for such claims.

Defendants first argue that First Capital fraudulently induced them into the Settlement Agreement by either concealing the true value of Strathmoor Plaza or misrepresenting its condition. During the settlement negotiations, First Capital informed Defendants that the property was worth no more than $900,000.00 and that it was "run down" and "needs a lot of work." Defendants claim that both of these statements fraudulently induced them into entering the Settlement Agreement. These statements, however, cannot support such claims.

4

Defendants claim that the property was worth more than $900,000.00 primarily based on an appraisal done over a year prior to the settlement negotiations and the fact that BDG listed the property for sale at that time for $1,100,000.00. However, when the property was listed for sale, the highest offer was $900,000.00. Moreover, Defendants knew all of this information during settlement negotiations. It may be a different case had First Capital conducted an appraisal, determined the value to be $1,000,000.00 and informed Defendants that the property was worth $900,000.00 without informing them of the appraisal. That is simply not what happened here. At the time of the settlement negotiations, Mr. Hammann firmly believed the property was worth more than $1,000,000.00 (Hammann Dep. 38:4-10, Nov. 2, 2009), yet he decided to accept the settlement offer valuing the property at $900,000.00. The Court cannot answer why he made that choice, but it is clear that it was not because he was deceived by First Capital or that he was relying on their valuation. Where the party claiming fraudulent inducement does not rely on any misstatement by the other party, a claim for fraudulent misrepresentation does not lie. *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. App. 2003) (setting forth the elements of fraud to include reliance).

The second alleged misrepresentation is that the property was "run down" and "needs a lot of work." Again, Mr. Hammann disagreed with these statements at the time they were made, was well aware of the condition of the property (Hammann Dep. 72:6-13) and could not have relied upon these statements in entering the Settlement Agreement.

Defendants' real complaint is that First Capital did not inform them that it planned to use the property for a bank branch location. Defendants claim that they never would have agreed to the $900,000.00 price had they known this. Of course, such a failure to disclose can only

5

invalidate the Settlement Agreement if there was a duty to make a disclosure. The Court cannot find such a duty. Defendants appear to argue that First Capital should have informed them of their intentions regarding the property because the parties were partners in BDG.[1] While it is generally true that a partner dealing with the on-going partnership has a duty to disclose any conflict of interest, the circumstances of this case are clearly different. Here, First Capital was not trying to take an action with or on behalf of the partnership. Rather, the partners were negotiating the dissolution of the partnership and dividing the assets of the partnership. It was clear to all parties that both First Capital and the Hammanns were exclusively acting on their own best interests, not in the interest of the other partner or the partnership. Moreover, Mr. Hammann recognized that, at the conclusion of the settlement, Strathmoor Plaza would be wholly owned by First Capital and understood that the bank could do with it as it pleased. That is the only reasonable interpretation of the settlement. Nothing forced First Capital to disclose its intended use of the property it was buying.[2]

Finally, Defendants seem to argue that First Capital allowed the property to be mismanaged before the settlement, leading to a decline in the value of the property. Such allegations, however, do not present a basis for invalidating the Settlement Agreement; they are not the basis for any form of fraudulent inducement in reaching the agreement. Rather, they are related to events occurring before the Settlement Agreement was reached, liability for which the agreement clearly releases all parties. Because the agreement is valid, Defendants cannot rely on

---

[1] Presumptively, it is this relationship that gives rise to the alleged fiduciary duty between the parties. As discussed, however, there was not breach of any such duty because First Capital had no obligation to disclose any more facts than it did.

[2] Perhaps equally important, Defendants have presented no evidence that First Capital actually had the specific intention of putting a bank branch at the Strathmoor Plaza location when the settlement was negotiated.

prior actions of First Capital to assert any claim or any defense to their obligations with respect to the $150,000.00 note.

In the end, this was an arm's length negotiation and deal between two parties, both of whom were adequately represented by legal and financial advisers. The Hammanns seem to believe they received the bad end of the deal. Even if that is true, it does not present a valid basis for invalidating the deal or excusing Defendants' performance on the note.

The Court will enter an Order consistent with this Memorandum Opinion.

cc:     Counsel of Record